2298 CRFD Research against DISH Network Corporation and Mr. Fahmy. Okay, no need to repeat what you've told us, but to take up the differences or the different references or whatever it is that helps your cause. Thank you, Your Honor. Let me begin by addressing Judge O'Malley's question from the last case, and that is with respect to the claims that are at issue. I realize 23 and 25 are separately at issue in this appeal, but what is it about 23 and 25 that you think, putting aside where we come out on the other claims, what is it about those two claims that you think distinguish your case as to those claims from the other claims? To be frank, Your Honor, we haven't argued the claims separately in so much as we've argued the references separately, because it's a different reference that's being relied upon. So I can't say there's anything in our papers that would necessarily distinguish claims 23 and 25. 23 is the independent claim. It's, for all intents and purposes, the same as Claim 1 insofar as this appeal is concerned. So it's still the specifying a second device that's at issue? Yes. Okay, and then 25 would flow from that as well? Right. We haven't argued any really distinction characteristics. Okay, I'm just trying to get the lay of the land here. I understand. Okay. So, Your Honors, in this case, it's another Fan reference, but this is the Fan-Helsinki reference that was found to be anticipating. Just chronologically, so that you've got it in mind, Fan-Helsinki was a paper that was published before Fan-San Jose. As the name suggests, the Fan-Helsinki paper was given in a conference in Helsinki. The San Jose paper was given at a conference in San Jose. They describe the same system, but the teachings are different. They are not simply two separate copies of the same reference. They actually contain very different content. The push mode that we talked about briefly a few minutes ago really isn't mentioned in the Helsinki paper. Everybody agrees. The experts agree. The board agrees. The parties, I think, agree. What's described in the Helsinki paper is the pull mode. And the description is actually more detailed than it is in Fan-San Jose, correct? Well, in some parts, yes, Your Honors. Specifically as it relates to your question of the user logging in with a user ID. Exactly. The pull mode is described in the Helsinki paper on page 1346 of the appendix in the right-hand column. And essentially what we're told is the user starts a browser, provides the user ID. The browser contacts the middleware server and begins a new session using that user ID. And if there's any previous session state that has been saved at the server, it can retrieve that session state if it exists. In the board's decision, the board decided that when the user, again, takes this action on the second device to resume the session, and here we're told that that's logging on, that somehow this was specifying the second device. And our point really is that no, it is not specifying the second device. It is doing exactly what it says it's doing, and that is identifying the user. Identifying the user does not inherently or explicitly identify the device. And the claim requires... But you agree that what they're saying was a factual conclusion. That their view that by identifying the user, you're necessarily identifying the device, and that's a factual conclusion that we review for substantial evidence. Yeah, I think that's right, Your Honor. I think the question of what a reference teaches is an issue of fact. And we're not contesting that. But those conclusions still have to meet the substantial evidence test. And here, there was nothing in the reference that would lead one to the conclusion that identifying the user is identifying the device. They are, in fact, different things. The other issue in this case that is raised by the DISH Network folks in their papers is that the court has an alternative basis for upholding the board's decision. And that was the argument that the board actually rejected and concerns their arguments about the Bates reference. Before we get to Bates, I just have two questions with respect to Van Helsinki. Do your obviousness and anticipation arguments rise and fall together as it relates to that reference? Yes, they do. And then what is your response to DISH's point that there is a distinction between specifying a device and identifying a device? You said the claims require specifying a device, not necessarily identifying a device. I don't think it was them making that argument, Your Honor. I think it was actually me. That simply because the server is notified which device it should send the... You were responding to their argument, which was that your claim doesn't say you have to identify a particular device. You have to ultimately specify one. Yes, that's correct. That is what we were saying. And as I go back to what we were saying a few moments ago, and that is the embodiments that are taught in 233 indicate that specifying is this notion of selection, explicit selection. And what happens in the Van Helsinki reference is the user logs on to an account and is provided with presumably this list or other indication that, hey, you've got some prior session histories available and the user can download those if he or she wants to. But there's no indication that the user specified the device that they were going to be logging in from, for example. It's simply the user ID that is associated with the session, not the device. So I think that was the point we were trying to make. Did that address your question, Your Honor? Yes. So as I mentioned, there is an argument that the board could find an alternative basis for upholding... And that was the argument the board rejected concerning the patentability or alleged unpatentability of the claims over Bates. Bates is going to be extensively discussed in our next case. But I would say that the board reached the correct decision there when it discussed the Bates reference. Because the board correctly observed that in Bates, the figure 7 embodiment shows what happens during the browsing session. And that includes transmission of the session histories. And the board correctly reasoned that the session that is recited in the claim is properly considered as also taking place during the time period that the board is using. What's your argument, though, in response to the contention that essentially what the board did was conflate the terms browsing session and session? Well, they didn't, Your Honor. In fact, the board went to some great lengths to discuss what each means. And the board concluded that the terms are not synonymous. That a session is actually involved and defines events. And that would be the series of information transactions between communicating devices during a particular time period. This is on page 8 of their decision. But the browsing session is something different. They said that, but then they ultimately said that if one is not terminated, then it's not after the session is discontinued. But a browsing session can still exist even after a session within the meaning of the claims is discontinued. I think that what the board was saying, Your Honor, is that the time period that is the browsing session is the session in the context of Bates. And this is on page 29 of their decision at the bottom. The alleged session in Bates, i.e. the series of information transactions between communicating devices, occurs during the time period of what Bates refers to as the browsing session. What about the idle period, at idle period command? Yes, that's one of the times when the transmission can take place. Right, so isn't that after the session has been discontinued because it's rendered idle? Even though the browsing session might still be alive? No, Your Honor, because there would still be an open connection to the network. See, the key insight in figure 7 is that all of those activities take place while this network connection exists. And that communication, the network communication, is the key to understanding the session definition that the board reached. Okay, but didn't your expert actually admit that when the user's computer in Bates reaches the idle period, that after a period of time the session ends, even though the browsing session continues? I'm not sure what you're referring to, Your Honor. Well, all right, I'm sure the other side will point it out. What you may be referring to, Your Honor, is that there was testimony, actually it was in the other case, not this case, about the hypothetical operation of a Windows machine, and I was planning to address that when we get to it in the next case. Okay, let's hear from the other side and we'll see if we leave that alone. Thank you, Your Honor. May it please the Court. Well, I have a former partner from this area who responded saying any fool can get to the merits. I know the Court has procedural questions that you've been asking about, which I'm happy to address, but otherwise I was going to plan to just talk about the merits of the challenge at issue in our appeal. Well, you can address whatever procedural questions we've asked already if you want us to repeat them. No, no, no, I don't know if you still have those questions. So with respect to the overlap between our appeal and some of the other appeals, so it's certainly true claims 23 and 25 were at issue in our petition and those claims were found invalid. Those were not at issue in the Iron Dome petition, so they weren't acted upon and aren't relevant to the first appeal. We appreciate that different petitioners might want to file their own petition. The question which arises in my mind is when, in fact, the same panel at the PTAB comes out with a completely opposed ruling on the same question of law or fact as it may be. Yeah, and I don't think that's what happened here, actually. Well, not between the two cases thus far, but we have a third case which went the other way. Well, even in our case, though, so Dish raised two grounds of invalidity. Well, we raised several grounds of invalidity, but two primary grounds of invalidity. One was based on this Fan-Helsinki reference. The Board agreed with us and found that Fan-Helsinki invalidated the claims. We also raised a challenge based on the Bates reference. As to that reference, the Board disagreed with us and found that the Bates reference did not invalidate the claims. The conclusion was the claims were invalid, obviously, because of the Fan-Helsinki reference, but it did reach two somewhat inconsistent conclusions as to the same claims. But that's entirely proper for the Board to do since it had two different references in front of it. Well, as far as your client is concerned, assuming that the decision is affirmed, whether based on deference or substantial evidence or whatever, I agree. But looking at the larger intent of the American Vence Act, I find this very strange. Yeah, well, it's true. I mean, I would have to concede there are some inefficiencies in the way the American Vence Act works. That, I think, is no accident. Maybe that was an understatement, but I think that was no accident. Congress recognized that as part of the bargain, the patentee is going to face invalidity challenges from both the public and especially from companies that it accuses of infringing its patents. Those companies have an incentive to bring in validity challenges, to go pursue prior art searches that perhaps the patent office didn't even consider during ex parte prosecution. That's a natural consequence of having a patent, is having to defend the validity of that patent against multiple challenges when they're brought. And the PTAB has now become obviously a popular venue to resolve those challenges in the first instance. So I think the PTAB is just working within the confines that Congress has created here, which... But now remind me, isn't the office authorized after there's a decision adverse to the patent owner to cancel the claims? Yes, and in fact, that's what I expect will happen here. If the court were to affirm, for instance, in our appeal, then the mandate would go back to the patent office to issue a cancellation certificate, which they would do. So there's a cancellation certificate, but meanwhile, I'll bring this up perhaps in the next cycle, the claims have been canceled, but nonetheless they've been held valid in another case against another petitioner, although they've been canceled. I'm wrestling with this. I don't want to use up your time to join in the battle, but I think this is something for serious public consideration. Sure, and I think one answer to that is that the board does not hold the claims valid. It just said the petitioner hadn't met its burden to show they were invalid. But it nonetheless cancels the claims. Well, it will cancel the claims if they find the petitioner did meet its burden. And then the next guy nonetheless is held to have infringed them. Well, once the claims are canceled, there will not be a finding of infringement. Are you sure? Well, I'm not going to say I'm sure, but I'm fairly confident. Let's continue with this case. Judge O'Malley was going to say the same thing. There was a different reference cited and somewhat different arguments, and that seems to be the premise on which this is to be considered. That's correct, and we have a different record here. We raised a different ground, a new prior reference, anticipation based on Van Helsinki that was not heard in your prior argument. There was a different record. Their expert was cross-examined separately in our proceeding, so he gave different testimony that was before the board in our proceeding as opposed to the other two. First, as to claims 23 and 25, we've now got a concession that they rise and fall with the others, right? So that distinction doesn't matter. As to Bates, that's a contingent argument, correct? That's right. We think you can affirm on the basis of Van Helsinki alone. You can agree with the board that Van Helsinki teaches specifying. I'll show you where that is in Van Helsinki, and that would resolve our challenge. As to the testimony in this case, am I correct that their expert essentially admitted that when the user's computer reaches the idle period, that the session will end at some point, and that that doesn't mean that the browser information or the browsing session has ended? You're asking now about the Bates ground, as I understand it. Because you brought it up about the different testimony. I just want to lock this point down. In Bates, that's right. As to the Bates ground, the patent owner's expert was asked at his deposition about the idle period in Bates. So there are various times in Bates when this browser session data can get transferred, and one of them is this idle period. So the question that was put to Dr. Mahapandra at 1795-96 of the Joint Appendix was this question. Moving to Figure 5, in your view, what is meant by the term at idle period? So we're asking him to interpret the reference for us as a person of skill in the art. The answer was, idle period is usually configured in the computer that if there is no interaction for, let's say, an hour or half an hour, then it goes to the idle mode. So basically it's kind of a sleep mode that the computer uses to save resources. So there he's interpreting for us what this thing is that's being taught in Bates. He's saying this means the computer is going to sleep, basically. Nothing has happened for half an hour or an hour. To us, that mission was now fatal to the claim, because that would show that in Bates there was no session happening. By the time this idle period occurs, there's no data going back and forth. The user is not even on the computer anymore. Therefore, the claim session was over. The transfer then occurs at that point, at this idle period, which is after the session is over. That's it. That was the only missing element the board found in Bates, was that the transfer didn't happen after the session was over. That's a clear example in Bates when that must have happened, just based on their own experts' admission about what Bates teaches. Now you can go back to Fan Helsinki, which is where I know you want to be. I'm happy to talk about either, but Fan Helsinki I think is the easier basis to affirm here, because there's no claim construction issue that's been argued or preserved here. The board very carefully analyzed that claim, found that specifying is intentionally a broad claim. The patentee claimed this very broadly. They didn't claim an order that the step has to occur in. They didn't say who has to do the specifying. They didn't say when the specifying has to happen. They didn't say who you have to specify it to. None of that. The claim is just intentionally written in this very broad manner, and under that broad interpretation, which the PTAB is entitled to use when resolving these disputes, it found there were several instances in Fan Helsinki that clearly taught that. For instance, the main one has to do with the inherent obvious thing that happens here when you're going to move to a new computer to then get your session. The way Fan works is you start doing some session at one computer, then you decide you're going to move to some other computer. You leave your first computer, and at that point the session goes into what he calls his middleware. It's some computer running up in the network somewhere. Then you move to your other computer, and you want to then go and get that information back from that middleware server. At that time, what you do is, from that device, you put in your user ID, and that communicates to the middleware server, and the middleware server sends back your session for you so that you can resume it. The board said in that case, of necessity, that is specifying the second device. In fact, they made a couple of factual findings that I'll point out to you. In the final written decision, this is the joint appendix of page 20, they said the middleware server in Fan Helsinki must receive enough information from the second device to be able to distinguish the chosen device from other potential devices. It's got to know what device you're on. If I'm going to send you your session, I've got to know what device you're on to send that session to. They said that must happen. Then they went on page 21 to say, otherwise, the middleware server would not be able to transmit the session history to the second device. It's very clear. They're saying Fan Helsinki doesn't work unless the claim is practiced. You have to specify the second device. Otherwise, what's disclosed in Fan Helsinki wouldn't work. There's a clear factual finding. There's no substantial evidence to disturb that finding. You said that's a matter of claim construction, which is a question of law? No, I'm saying there was no claim construction dispute. There's a claim construction as to the breadth in light of the specification? Yeah. The board addressed that in its final written decision. It construed the claim. It said there's no order required. It doesn't say to who or from whom this is specified. It did reach a claim construction, but my point is that's not really raised on appeal. There's no competing construction that's being offered to you to overrule the board on that. In any event, there's no basis to... But it's raised on the position that that's not limiting, that that broad construction is either incorrect? I don't think that that's being preserved. I suppose you can ask my friend on the other side if he's objecting to the claim construction. Unless it is incorrect, their case of anticipation really loses its substance. So they have to take that position, don't they? As I understand their challenge, they're challenging the sufficiency of the board's factual finding that what Fan-Helsinki teaches is specifying. That's what I perceive to be the challenge that's being made here, is questioning the board's factual finding that what Fan-Helsinki teaches is specifying. I don't think they're challenging what the board has said about what the claim means. That's my point. As to that factual finding, the board's finding was further supported by the patent owner's own expert testimony. Again, he was asked at Joint Appendix 1773 during his deposition, do you agree, though, that in the Fan model, the Fan-Pull model, that the second device is specified? Answer, second device is specified at some point in time, yes, in the Pull model. That was a concession that the patent owner's own expert made that the board relied on. Frankly, there's just no evidence for any other conclusion. There's no evidence in the record that would support a board's conclusion that specifying doesn't occur. There was another basis in Fan-Helsinki that the board did focus on, which is this notion of device profiling. Here, the notion is that in Fan-Helsinki, you might be on a laptop, you might be on a handheld phone, you might be on a desktop. These are all different types of devices. This middleware server can actually know information about what kind of device you're on to help it provide the information to you. Maybe it would reformat that information if you were on a phone instead of a computer. It might take some of the data out. Fan talks about this in a couple places. It refers to this concept as both device profiling or presentation conversion. For instance, at Joint Appendix 1345, it mentions the presentation conversion aspect and notes that the middleware server can perform conversion as needed. That's also discussed in the Figure 2, which is also on page 1345, which shows device profiling and presentation conversion. Importantly, in the board's final written decision, they relied on the teachings of Fan-Helsinki. For instance, in the final written decision at 13, the board discussed that portion of Fan-Helsinki and noted that that shows converting data for the particular client device requesting it. Therefore, the point is that you must know something, you must have specified something about this second device in order to perform that type of conversion of data. That's certainly substantial evidence in the record that would support the board's conclusion that specifying is taught in Fan-Helsinki. The second device is specified in at least those two ways, both because you have to know what device to send the data to and because you have to know what type of device it is that I'm sending the data to to make that work. Any questions for Mr. Williams? Any more questions? I'd like to begin with comments that were made by my friend concerning the idle period. This goes to the Bates reference. In fact, the board discussed this at length in their opinion. The point that the board found wanting in this argument is at page 32 of their decision. Petitioner does not account for the actual disclosure of Bates, indicating that a session would occur during the browsing session time period, which includes transmission of the session history. What the board is saying, Your Honor, is that the hypothetical being posed by the petitioner is actually something that Bates says doesn't happen. If the entirety of Figure 7 occurs during the browsing session, which Bates clearly says happens, column 8, lines 55 through 57, that includes recognition of the idle period. So the idle period taking place doesn't negate the browsing session. In fact, the browsing session, one of the things that is happening is it's looking for the idle period. And so then would execute the process that's shown in Figure 7. That was the board's rationale for rejecting that position. Judge Newman, you talked about the problem that arises when claims get canceled. Just to be clear, no claims have yet been canceled. The IPR procedure doesn't formally end until a cancellation or an IPR certificate is issued, either indicating cancellation of claims or confirming the patentability of claims. In that respect, it's very much like the re-exam practice that we're used to. The re-exam isn't over until the certificate issues. The process of that certificate issuance takes several months. In this series of cases, it's actually pending decision by this court. Theoretically, we could say, for instance, say in maybe the first two cases, we could reverse the board as it relates to the FAN references, maybe look at the Bates references and either affirm or reverse, so the grounds for cancellation aren't really clear yet. Your Honors, in their response brief, DISH Networks admits that FAN Helsinki permits any device to resume a session by contacting the middleware server. This is in their brief at page 11. In other words, no second device needs to be specified, so the session transfer is made based on the user identification, as we looked at in the FAN reference. With respect to the collateral grounds with Bates, the board examined the Bates teachings, examined the share events that were described by Bates that are looked for during the browsing session, and correctly observed that those all take place during the browsing session. And so the sequence of events that's required by the claims would not be found in Bates. Unless there are further questions, we'll leave it to your sound judgment. I think that that takes this case under submission.